IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ARTHUR M. KENNEDY IV,

                Plaintiff,                OPINION AND ORDER

  v.

                                              22-cv-005-wmc

RN DENISE VALERIUS,

                Defendant.

---

ARTHUR M. KENNEDY IV,

                Plaintiff,

  v.

                                             22-cv-006-wmc

RN BONNIE ALT,

                Defendant.

---

In these consolidated cases, plaintiff and state prisoner Arthur Kennedy contends that Nurses Denise Valerius and Bonnie Alt failed to arrange adequate medical care for his serious blood disorders in violation of the Eighth Amendment. Now before the court are the parties' cross-motions for summary judgment, which must be denied in light of genuine disputes of material fact regarding whether defendants consciously disregarded plaintiff's serious medical needs. In particular, a reasonable jury could find that defendants knew that they needed to arrange treatment for plaintiff's condition with greater urgency, but refused to do so. It is also reasonable to infer that plaintiff's pain and other symptoms would have been lessened if defendants had acted more swiftly. Thus, the case will proceed to trial on whether defendants violated the Eighth Amendment and caused plaintiff

unnecessary pain and discomfort. However, the court will strike the current schedule and attempt to recruit counsel to represent plaintiff at trial.

## UNDISPUTED FACTS

Plaintiff Arthur Kennedy suffers from three rare blood and bone marrow disorders: aplastic anemia; paroxysmal nocturnal hemoglobinuria; and myelodysplastic blood cancer. All three disorders affect Kennedy's supply of red blood cells, and each can cause pain and other symptoms, including fatigue, weakness, pale skin, unexplained or easy bruising, nosebleeds, bleeding gums, shortness of breath, increased heart rate, frequent infections, irregular heartbeat, dizziness, fever, headache, and abnormal blood clotting. To manage his disorders, Kennedy receives red blood cell transfusions when his hemoglobin levels drop below a certain threshold. Kennedy's hemoglobin levels are normally in the range of 7–9 grams per deciliter (g/dl), well below the 13.7–17.5 g/dl range of a healthy individual.

Between January 29 and May 11, 2021, Kennedy was housed at Dodge Correctional Institution, where his bone marrow conditions were managed by Froedtert Medical College of Wisconsin Cancer Center in Milwaukee. His treatment plan included bi-weekly labs with supportive red blood cell transfusions if his hemoglobin levels dipped below 8.0 g/dL. Because frequent transfusions can cause iron overload, fatigue, decreased appetite, nausea, dizziness and fluctuating body temperatures, Kennedy also received medication to treat iron overload, as well as infusions of Ravulizumab every eight weeks. Ravulizumab is designed to inhibit the premature death of blood cells, which can lessen the need for supportive blood transfusions.

On May 11, 2021, Kennedy was transferred from Dodge to Columbia Correctional Institution. In conjunction with his transfer, treatment for Kennedy's bone marrow conditions was to be passed from Froedtert to the University of Wisconsin Hematology in Madison. However, a delay in transferring Kennedy's medical records resulted in a delay in his normal, two-week blood transfusion in May 2021.[1]

Understandably concerned that his care would be further interrupted by his transfer, Kennedy submitted multiple Interview/Information Requests to the Health Services Unit regarding scheduling his Ravulizumab infusions. Specifically, he submitted requests on May 20, May 23, and June 15, repeatedly reminding HSU staff that: he needed the Ravulizumab infusion every eight weeks, which would next be due in mid-June, and asking whether it had been scheduled. Although staff responded that he was scheduled for an infusion on June 18, Kennedy did not in fact receive his Ravulizumab infusion on June 18, prompting him to send three, additional Interview/Information Requests, one on June 21 and two on June 26, stating as much and asking whether HSU had contacted his providers at Froedtert, as well as asking that his ongoing requests be called to the attention of his primary care provider at the prison, Advanced Practice Nurse Prescriber Kristine Lyon.

Nurse Valerius responded to all three of these requests on June 28, 2021, in relevant part as follows: "your (Ravalizumab) infusion is being scheduled locally; we cannot provide

---

[1] By late May or early June, Kennedy was again receiving regular lab work and blood transfusions, although Kennedy says he still did not receive those transfusions as often as previously scheduled -- a dispute that is immaterial for purposes of summary judgment because he does not claim that either remaining defendant was responsible for any subsequent delays in those treatments.

3

transport to Froedtert so your care will be shifted to UW Hematology. Your Froedtert records have been forwarded to them. We are hoping to get your infusion scheduled next week locally here at Aspirus Hospital." (Dkt. #118-3, at 9.) However, Nurse Valerius neither forwarded Kennedy's requests to APNP Lyon, nor did she follow up with the scheduler. As she states in her declaration, this was because of her "understanding that Kennedy's care was in the process of being transferred to UW Hospital from Froedtert." (Valerius Decl. (dkt. #120) ¶ 32.) In addition, Valerius attests that she had no control over scheduling offsite appointments or determining when or where they occurred. After receiving Valerius's response, Kennedy next reached out to Columbia's security director directly, who told him that transport to Froedtert would be arranged if ordered by HSU staff. However, HSU still declined to send him to Froedtert for his infusion, apparently choosing instead to continue to try to schedule him with UW Hematology.

Sometime in early July, APNP Lyons first learned that Kennedy had not received his June 18 infusion of Ravalizumab. She further confirmed with Froedtert that he should still be receiving a maintenance dose of that medication bi-monthly. At that point, Columbia HSU staff called Froedtert to request an appointment for the infusion. Meanwhile, Kennedy continued to submit health services requests in July complaining both that (1) his Ravalizumab infusion had been delayed and (2) he was experiencing symptoms of headaches, dizziness, fatigue, and shortness of breath because his red blood transfusions were not being provided frequently enough.

On August 1, 2021, Kennedy again submitted an Interview/Information Request, stating that he had been having fatigue, shortness of breath, chest pain, and dizziness since

the previous week and he needed a blood transfusion. However, HSU apparently did not review the request until the next day, and around midnight on the night of August 1, Kennedy passed out, remaining on the floor of his cell for several minutes. Security staff called HSU to report that Kennedy had fallen and was unresponsive. By the time Nurse Alt arrived at his cell, Kennedy was awake and security staff were able to assist him into a wheelchair. At that point, Kennedy told Nurse Alt that he had a blood condition; he knew what the signs were; and he'd been having headaches, chest pain and shortness of breath for the last several days, which were always signs that he needed a blood transfusion. Kennedy also told her, and Alt confirmed, that his hemoglobin level was 7.7 g/dL nearly a week ago, which meant that it was likely at a dangerously low level now. Nevertheless, Nurse Alt concluded that Kennedy was "medically stable" and did not need urgent care because: his vitals were stable and his most recent hemoglobin levels were above the threshold for which his UW doctor said he should receive a transfusion.

      According to Nurse Alt, she also updated HSU's day shift the next morning regarding Kennedy's medical condition so that he could receive follow-up care and have a blood transfusion arranged, if necessary. Alt also represents that day-shift staff then contacted UW Hospital about Kennedy's condition, who recommended that he be transported to the hospital. Kennedy disputes this, however, stating that he was transported to the hospital only after reporting to the health services unit the following day to receive routine medication, telling a nurse about what had happened the previous night, and reporting that he had continued to experience pain, shortness of breath and

5

dizziness. When Kennedy was transported to the hospital, his hemoglobin level was 6.8 g/dL, and he received a blood transfusion in the emergency room.

Kennedy did not receive his first Ravulizumab infusion at UW Health until September 3, 2021, some ten weeks after he should have received it.

OPINION

Plaintiff asserts Eighth Amendment claims against Nurses Valerius and Alt. The standard for an Eighth Amendment claim about medical care is based on the concept of "deliberate indifference," which means that the defendant knows the prisoner needs medical treatment, but the defendant is disregarding that need. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Several circumstances can permit a jury to reasonably infer deliberate indifference, such as denial of medical treatment altogether, delay of medical care, continued ineffective treatment, "a substantial departure from accepted professional judgment, practice, or standards," ignoring an obvious risk, and refusing care because of cost. *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (citations omitted). However, "negligence, gross negligence, or even recklessness as the term is used in tort cases is not enough – the prison officials' state of mind must rise to the level of deliberate indifference." *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (citation omitted).

Plaintiff must prove four things to succeed on his Eighth Amendment medical care claims: (1) he had a serious medical need; (2) the defendant was aware that the plaintiff had a serious medical need; (3) the defendant consciously failed to take reasonable measures to provide treatment for the serious medical need; and (4) plaintiff was injured because of the defendant's action or inaction. Federal Civil Jury Instructions of the Seventh

6

Circuit § 7.17 (2017).  For the purpose of their summary judgment motion, defendants do not challenge that plaintiff had a serious medical need or that they were aware he had a serious medical need.  Instead, defendants contend that they acted reasonably based on the information available, and that there is no causal connection between their alleged failures and any harm to plaintiff.

Turning first to Nurse Valerius, plaintiff contends that her failure to investigate whether plaintiff could be sent to Froedtert hospital for a Ravulizumab infusion in June 2021 amounted to deliberate indifference to his medical need.  For her part, Valerius denies having responsibility for the delay in scheduling plaintiff's infusion and, in any event, argues that plaintiff suffered no harm from the delay.  The problem with Valerius's response is that it fails to acknowledge: (1) she was aware of plaintiff's serious medical conditions; (2) she was aware that plaintiff should have received, but did not receive, an infusion on June 18 to treat his conditions; (3) there was apparently no indication in plaintiff's medical records that an infusion was even scheduled at the time she responded to plaintiff; and (4) it was possible, at least according to the Security Director, for plaintiff to receive his infusion at Froedtert, if deemed necessary by HSU.  With this information, a reasonable jury might well conclude that Valerius acted negligently, at most, by failing to follow up and determine whether plaintiff's need for scheduling had fallen through the cracks.  However, a reasonable jury might also conclude that Valerius acted with deliberate indifference in failing to notify plaintiff's primary care provider and the scheduler that plaintiff's infusion had not occurred as scheduled, to ask about the risks of any additional

7

delay of uncertain length in his receiving an infusion, and to ask whether sending plaintiff to Froedtert was feasible.

Moreover, plaintiff has submitted sufficient evidence to dispute whether he experienced negative health impacts due to the delayed Ravulizumab infusion. Specifically, he describes more symptoms consistent with his blood and bone marrow conditions during the summer of 2021, and needing more blood transfusions than he otherwise did. Although defendants argue that plaintiff actually received *fewer* blood transfusions while he was at Columbia than he did while at Dodge, this evidence actually supports plaintiff's version of events: according to plaintiff, he needed more blood transfusions, but the HSU at Columbia was less responsive and failed to arrange transfusions in a timely manner. Regardless, based on the disputed evidence, plaintiff's claim against defendant Valerius must move forward past summary judgment.

Turning next to plaintiff's claim against Nurse Alt, plaintiff contends that Alt violated his Eighth Amendment rights by refusing to send him to the hospital for emergency treatment despite knowing he had passed out in his cell and was experiencing symptoms suggesting the need for a blood transfusion. Plaintiff further contends that Alt should have recognized the seriousness of these symptoms and referred plaintiff for a blood transfusion immediately. In contrast, Alt argues that plaintiff cannot succeed on his claim because she exercised professional judgment in assessing plaintiff's need for emergency medical care. Specifically, there is no dispute that she applied nursing guidelines, assessed plaintiff's vitals, and concluded that he did not need emergency treatment, but rather could wait and be reassessed by the day shift. She also argues that plaintiff was not in distress

8

when she assessed him, so he suffered no injury by waiting until the following day to receive a blood transfusion. However, there are also genuine disputes of material fact regarding whether Alt's conduct ignored obvious risks or amounted to a reckless departure from accepted professional judgment, practice or standards. For example, Alt knew that plaintiff had serious bone marrow conditions that could cause the very symptoms that plaintiff was reporting, including chest pain, difficulty breathing, headaches and loss of consciousness. She also knew that plaintiff's hemoglobin levels had been assessed as 7.7 g/dl nearly a week ago and likely dropped since then, to what could be a critical level.

Given these facts, a reasonable jury might infer that based on her knowledge and expertise, Alt knew that assessing plaintiff's vitals and referring plaintiff for follow up was not providing reasonable treatment to plaintiff. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("[A] doctor's choice of the easier and less efficacious treatment for an objectively serious medical condition can…amount to deliberate indifference for purposes of the Eighth Amendment.") (internal quotation marks omitted)); *Ortiz v. Webster*, 655 F.3d 731, 735 (7th Cir. 2011) ("Physicians cannot escape liability simply by refusing to verify underlying facts regarding the potential need for treatment." (internal quotation marks omitted)). In addition, there is a factual dispute whether and what Alt reported to HSU staff regarding plaintiff's status: if a jury believed plaintiff's version of events, HSU day staff was still unaware of plaintiff's loss of consciousness and other symptoms until he saw HSU staff the following afternoon for a routine medication visit. Thus, a reasonably jury could infer that Alt acted with deliberate indifference in failing to arrange emergency care for plaintiff and failing to properly notify HSU staff of plaintiff's condition, causing

9

plaintiff to suffer pain and discomfort unnecessarily. Accordingly, summary judgment must be denied on plaintiff's claim against this defendant as well.[2]

ORDER

IT IS ORDERED that:

1) Defendants' motions for summary judgment ('05 case, dkt. #116; '06 case, dkt. #113) are DENIED.

2) Plaintiff Arthur Kennedy's motions ('05 case, dkt. ##75–76; '06 case, dkt. ##72, 73) are DENIED and GRANTED IN PART as provided above.

3) Plaintiff's motion to include additional brief and declaration to strike portions of Dr. Sukowaty's declaration ('05 case, dkt. ##128, 143; '06 case, dkt. ##125, 140) are DENIED as moot.

4) The court will *sua sponte* STRIKE all deadlines in this case and attempt to recruit counsel for plaintiff for trial.

5) Defendants' motions to stay deadlines pending decision on summary judgment ('05 case. dkt. #148; '06 case, dkt. #145) are DENIED as moot.

Entered this 21st day of September, 2023.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[2] Defendants also make a superficial qualified immunity argument, but it is completely undeveloped. (Dkt. #122, at 21–22.) In particular, defendants do not explain what part of plaintiff's claim is not clearly established under the long line of Eighth Amendment medical care decisions in the prison setting. Although the plaintiff has the burden of defeating a qualified immunity defense once raised, *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013), remaining factual uncertainties and defendants' legal boilerplate is not sufficient to prevail at summary judgment.